IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**

**JASON L. WHITE,**

    **Defendant.**                                    **No. 12-cr-30022-DRH**

## MEMORANDUM AND ORDER

**HERNDON, Chief Judge:**

### I. Introduction and Background

Pending before the Court is White's motion to suppress evidence (Doc. 26). The Government opposes the motion (Doc. 46), arguing the evidence was found pursuant to a third party consensual search and pursuant to White's Mandatory Supervised Release Agreement ("MSR") as a condition of his parole. On October 12, 2012, the Court heard several of White's motions, including his motion to suppress, and granted his request to continue the suppression hearing to allow White to put on an additional witness. On January 17, 2013, the Court conducted the continued suppression hearing, heard testimony, and took the matter under advisement. Based on the following, the Court denies White's motion to suppress.

On November 24, 2010, White signed an MSR as a condition of his parole for possession/use of a firearm by a felon. The MSR stated, among other things,

"[y]ou shall consent to a search of your person, property, or residence under your control."

On March 22, 2011, White was named as a suspect in the shooting of a man during an altercation, after the victim identified White as the shooter. White's parole officer, Mark Junge, attempted to locate White three times to fit him with an electronic monitoring device, but was unsuccessful. On March 25, 2011, Venice police attempted to stop White, but he fled on foot and was able to elude capture. On March 29, 2011, as a result of the shooting and Junge's earlier concerns in finding packaging for a gun in White's room, combined with his inability to locate White, an arrest warrant was issued for White. The arrest warrant stated that White was considered armed and dangerous.

Junge, a member of the U.S. Marshals' Fugitive Task Force sought help from other members to locate and arrest White. On March 31, 2011, upon receiving information that White had been seen in the company of his cousin, Tawanna Williams, several members of the task force, including Junge and Deputy Marshal Thomas Woods, went to Williams' residence, seeking White.

Williams told the marshals her cousin was not at her house, but she had met up with White earlier in the day and he had put a gym bag in her vehicle. After they searched her house and did not find White, Williams gave the officers consent to search her vehicle. In the course of said search, the officers found White's unlocked bag containing the gun that is the subject of this motion to

suppress. Officers asked Williams to go down to the East St. Louis Police station to make a statement.

At the continuation of the suppression hearing January 17, 2013, Williams testified that the events of March 31, 2011 occurred differently from the officers' version, and that she gave consent for officers to search her car only under duress and upon threat of arrest. During cross-examination, AUSA Stephen Clark played a video recording of Williams' interview at the East St. Louis police station, following the finding of White's bag and the gun in her car. The recording contradicted Williams' version of the search to which she testified. The recording showed her agreeing with the police officer when he thanked her for her help and cooperation in allowing the officers at her house to search her car. Moreover, Woods testified that Williams volunteered permission for the officers to search her car.

In moving to suppress, White claims that the search was illegal because he had a reasonable expectation of privacy and therefore, all evidence seized must be suppressed as "fruit of the poisonous tree."

## II.    Analysis

The Fourth Amendment to the United States Constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *U.S. v. Jones*, 132 S.Ct. 945, 949 (2012). We examine the "totality of the circumstances" to determine whether a search is reasonable under the Fourth

Amendment. *Samson v. California*, 547 U.S. 843, 848 (2006). Under such an examination, the court balances the "degree to which [the search] intrudes upon an individual's privacy and . . . the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* In *United States v. Knights*, the Supreme Court held that a search was reasonable when predicated on Knights' probation order clearly setting out that he was required to submit his person, property, place of residence, vehicle, or personal effects to a search at any time regardless of any type of warrant, or reasonable cause by a law enforcement officer. 534 U.S. 112, 114 (2001). The Court also found that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 121. However, because Knights' probation officer had reasonable suspicion, the Court did not reach the question of whether the search would have been reasonable under the Fourth Amendment solely predicated on the condition of probation. *Id.* at 120, n.6.

Five years later, the Supreme Court addressed that question in the context of a parolee search. *Samson*, 547 U.S. at 850. The Court found that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Id.* "The essence of parole is release from prison, before the completion of a sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Id.*

(internal citations omitted). The Court further held that parolees are entitled to even less of the "average citizen's absolute liberty" than are probationers. *Id.* The *Samson* Court explained that a State has an "overwhelming interest in supervising parolees because parolees . . . are more likely to commit future criminal offenses." *Id.* at 853. Moreover, examined under the totality of the circumstances, including "the plain terms of the parole search condition," the Court concluded that the petitioner did not have a legitimate expectation of privacy. *Id.* at 852. Thus, the Fourth Amendment does not prohibit a law enforcement officer from conducting a suspicionless search of a parolee. *Id.* at 856.

In a similar case to the case before us, the Illinois Supreme Court, following *Samson*, held that due to the defendant's parolee status and the plain language of his MSR agreement, no reasonable suspicion was required for a warrantless search of the defendant's property. *People v. Wilson*, 885 N.E.2d 1033, 1043 (Ill. 2008). In *Wilson*, the defendant signed his MSR agreement as a condition of his parole, which stated, among other things, that he would consent to a search of his person, property or residence under his control. *Id.* at 1036. In the course of a warrantless search without consent, the defendant's parole officer found drugs in the defendant's bedroom. *Id.* The trial court denied the defendant's motion to suppress evidence, finding defendant consented to the search when he signed his MSR agreement. *Id.* On appeal, the appellate court reversed. *Id.*

The *Wilson* Court considered the language of the defendant's MSR agreement in light of the *Samson* decision. *Id.* at 1043. Citing a principle from

*Samson* that "a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would otherwise not be tolerated under the Fourth Amendment," the *Wilson* court held that any expectation of privacy by a parolee would "diminish the protection to society given by the search condition of parole, permitting search at any time." *Id.* (internal citations and quotations omitted). In Illinois, prisoners eligible for parole must sign an MSR agreement to secure their release from physical custody of the Department of Corrections ("DOC"); however parolees remain in the legal custody of the DOC for the duration of their parole. *Id.* at 1041. An inmate who refuses to sign his MSR agreement remains in the physical custody of the DOC. *Id.*

In the instant case, as in *Wilson*, White signed his MSR agreement as a condition of his parole. He agreed to a search of his person, property, or residence under his control. On the day the marshals found and opened White's gym bag, which he had placed in his cousin's car, White was a State fugitive and was a suspect in a shooting with injuries. He was also considered armed and dangerous, giving the State "an overwhelming interest" in finding him. Similar to the facts in *Knights*, there was "enough likelihood that criminal conduct [was] occurring, that an intrusion" on White's substantially diminished privacy interests was reasonable. *Knights*, 534 U.S. at 121.

Considering the totality of the circumstances in this case, the Court finds that White did in fact consent to the search of his bag by signing his MSR

agreement. Similar to the defendant in *Samson*, White's Fourth Amendment rights and his expectation of privacy were "severely diminished" by virtue of his status as a parolee.

### III. Conclusion

Accordingly, the Court **DENIES** the motion to suppress (Doc. 26). The parties are reminded that this matter is set for jury trial for February 4, 2013 at 9:00 a.m.

**IT IS SO ORDERED.**

Signed this 23rd day of January, 2013.

Digitally signed by
David R. Herndon
Date: 2013.01.23
16:24:44 -06'00'

Chief Judge
United States District Court